IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**STEVEN J. ABRAHAM, et al.**

Plaintiffs,

v.                                              Case No. CIV-09-961 WDS/RLP

**BP AMERICA PRODUCTION COMPANY,**

Defendant.

## MEMORANDUM OPINION AND ORDER

This matter came before on several motions filed by the parties. Plaintiffs filed a Motion for Summary Judgment on Breach of Contract and Breach of the Duty to Market (Doc. 148) and a Motion to Exclude the Opinion Testimony of BP Expert Witness Dr. Stephen L. Becker. (Doc. 146) Defendant BP filed a Motion For Summary Judgment on Compliance with the "Market Value at the Well" Contractual Royalty Obligation (Doc. 137) and a Motion for Summary Judgment on Plaintiffs' Punitive Damages Claim. (Doc. 140) Having considered the submissions and arguments of counsel, relevant law, and being otherwise fully advised, the Court denies Plaintiffs' Motion for Summary Judgment and Plaintiffs' Motion to Exclude the Testimony of Dr. Becker. The Court denies BP's Motion for Summary Judgment on its royalty obligation and grants BP's Motion for Summary Judgment on the punitive damages claim.

**I. Background.**

Plaintiffs are royalty owners whose interests burden Defendant BP's natural gas leases in the San Juan Basin. The contract between the parties calls for BP to pay royalties based on the market value of the natural gas "at the well." However, the natural gas is not sold at the well. Instead, it is transported via the Enterprise Gathering System to BP's New Blanco Plant, where it is processed.

The processing extracts Natural Gas Liquids ("NGLs") from the natural gas that is collected at the well head.  The NGLs are transported by pipeline for further processing which separates the NGLs into marketable products such as butane and ethane.  The residue natural gas is sold as such.  There is no "sale" of the natural gas products until they are downstream of the New Blanco Plant.

To approximate the value of the natural gas at the well, Defendant starts with the value of the refined natural gas products (residue gas and NGLs) and works backward, subtracting out the costs of gathering the gas through the Enterprise system and processing it at the New Blanco plant.  This is called the "work-back" method.  There does not appear to be a dispute regarding the costs of the Enterprise Gathering system.  Rather, the issue in this case is the cost of BP's processing of the gas at the Blanco Plant.  BP does not charge a cash fee for processing natural gas at the Blanco Plant, but charges an in-kind fee of 25% of the NGLs.  BP is a 50% owner of the New Blanco Plant.

BP contends that it has accurately utilized the work-back method to calculate a fair value of the unprocessed natural gas at the well.  Plaintiffs allege that BP does not sell the NGLs at a fair market value, i.e., that it sells the NGLs to an affiliate in a non-arm's length transaction.  Further, Plaintiff's allege that BP's processing fee of 25% of the value of the NGLs is not an actual fee, because BP has an ownership interest in the New Blanco Plant and does not have to pay a fee to process gas there. Plaintiffs argue that the value of the gas at the well should be calculated with a higher starting value for the refined natural gas products and without the 25% processing fee.

**II. Standard.**

As a general rule, summary judgment should be granted where the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Bewley v. City of Duncan*, 1998 WL 314382 *3-4 (10th Cir. 1998) (citing Fed.R.Civ.P. 56(c)).  A genuine issue of material fact exists if the parties have

presented sufficient evidence from which a trier of fact could resolve the issue either way. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the non-movant fails to provide sufficient evidence on an essential element of his prima facie case, however, all issues concerning all other elements of the claim become immaterial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Accordingly, although evidence is viewed and inferences drawn "… in a light most favorable to the party opposing summary judgment ... that party must identify sufficient evidence which would require submission of the case to a jury." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1402 (10th Cir.1997).

The Court will first address the Plaintiffs' motion for summary judgment relating to calculation of the value of the gas at the well head, followed by Plaintiffs' motion on the duty to market and Plaintiffs' motion to exclude the testimony of Dr. Becker. Then the Court will address Defendant's motion for summary judgment on its royalty obligations and Defendant's motion for summary judgment on punitive damages.

**III. Discussion.**

**A.  Plaintiffs' Motion for Summary Judgment on Breach of Contract**

In analyzing the parties' various arguments relating to the calculation of the value of the natural gas at the well, the Court relies on *Elliott Industries Limited Partnership v. BP America Production Co. et al.*, 407 F. 3d 1091 (10th Cir. 2005). *Elliott*, in turn, relied on *Creson v. Amoco Production Co*. 129 N.M. 529, 10 P.3d 853 (N.M. Ct. App. 2000) for guidance in determining the meaning of "at the well." 407 F.3d at 1110. The *Creson* court held that "royalties for gas sold downstream were subject to deductions for post-production, value-enhancing costs," 10 P.3d at 862, and the Tenth Circuit concurred, stating that the "at the well" royalty obligations do require royalty payments based on the unprocessed gas as it emerges at the wellhead. 407 F.3d at 1110.

In Elliott, the Tenth Circuit affirmed the District Court's summary judgment in favor of BP and provided the following guidance with respect to a determination of whether BP had complied with its "at the well" royalty obligations:

> Whether Appellees' complied with these "at the well" royalty obligations, however, depends upon whether the 39% "charge" is a post-production cost that may properly be deducted under the net-back or work-back methodology in order to arrive at the correct "at the well" value. To determine compliance, there would appear to be at least three questions which must be answered: (1) whether the 39% fee is properly characterized as a "processing cost" such that it is a post-production cost subject to deduction; (2) whether such deductible costs must be "actual and reasonable" and, if so, whether the 39% is an "actual and reasonable" cost; and (3) whether the gas is in fact marketable at the wellhead.

*Elliott Indus. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1110 (10th Cir. N.M. 2005)

In their motion for summary judgment, Plaintiffs argue that BP's processing fee of 25% of the value of the NGLs is not an actual fee, because BP has an ownership interest in the New Blanco Plant and does not have to pay a fee to process gas there[1]. They describe the 25% fee as "fictional," such that BP should not be allowed to deduct the fee as part of its work-back calculation. Plaintiffs' argument misses the mark and is not well taken. *Creson* makes clear that a proper work-back calculation focuses on "deductions for post-production, value-enhancing costs." While BP does not pay a fee to process gas at the New Blanco Plant, it is beyond question that BP incurs a cost to operate the New Blanco Plant. It is also unquestioned that the function that the plant serves, separating the NGLs from the residual gas stream, adds value to the gas stream, i.e., the combined value of the residue gas and NGLs leaving the New Blanco Plant is greater than the value of the unprocessed gas "as it emerges at the wellhead." Accordingly, the New Blanco Plant is one example of the "post-production, value-enhancing costs" referenced in *Creson*.

---

[1] On page 2 of Plaintiffs' exhibits presented at oral argument, for example, Plaintiffs stated "BP pays no fee for processing its own gas."

4

During oral argument, Plaintiffs' counsel essentially admitted as much, noting with approval that Conoco, BP's 50% partner in operating the New Blanco Plant, charges a cash fee for processing natural gas at the plant. The Court notes that there is no legal significance to the fact that Conoco appears to charge a cash fee, while BP takes payment in-kind, i.e., 25% of the NGLs separated from the gas stream. The only question would appear to be whether BP's 25% charge is a reasonable deduction "for post-production, value-enhancing costs," i.e., the operation of the New Blanco Plant.

Accordingly, in the Court's opinion the operation of the New Blanco Plant is properly characterized as a "processing cost" such that it is a post-production cost subject to deduction in the work-back calculation. Additionally, in the Court's opinion the cost of running the New Blanco Plant is an "actual" cost. The Court rejects Plaintiffs' argument that there is no actual cost because BP pays no fee for processing its own gas. Under Creson, BP is entitled to deduct post-production, value-enhancing costs. The New Blanco Plant adds value to the gas stream and there are actual costs associated with operating the plant. The remaining question is the reasonableness of BP's New Blanco deduction for these costs. This is clearly a question for the jury. Similarly, to the extent that Plaintiffs question the reasonableness of the residue gas and NGL values that BP utilizes to start the work-back process, the reasonableness of those values is a question for the jury.

## B.  Plaintiffs' Motion for Summary Judgment on Duty to Market

Plaintiffs argue that an implied duty to market exists in the present case. New Mexico has long recognized a mineral lessee's obligation under the implied duty to market to "proceed with reasonable diligence, as viewed from the standpoint of a reasonably prudent operator, having in mind his own interest as well as that of the lessor, to market the product." *Libby v. De Baca,* 51 N.M. 95, 179 P.2d 263, 265 (1947). The New Mexico Supreme Court later characterized the implied duty to market as an "implied covenant to make diligent efforts to market the production in order

that the lessor may realize on his royalty interest." *Darr v. Eldridge,* 66 N.M. 260, 346 P.2d 1041, 1044 (1959). Plaintiffs contend that Defendant breached this duty to market because (1) it does not market 25% of the NGLs for the benefit of the royalty owners even though it does so for its own financial benefit and (2) by utilizing affiliate transfer prices and not true sales prices, Defendant has failed to obtain the best prices and terms available for the benefit of the royalty owners.

Defendant does not dispute that a duty to market can be implied under New Mexico law, but argues that *Elliott Industries Ltd. Partnership v. BP America Production Co.,* 407 F.3d 1091 (10th Cir. 2005) ("*Elliott*") has foreclosed Plaintiff's implied duty to market claim. Plaintiffs contend that *Elliott* does not apply to their case because the *Elliott* plaintiffs did not raise any issue regarding the failure to market NGLs or the affiliate transfer prices.

In *Elliott*, Plaintiffs argued that under the duty to market, Defendants were obligated to pay royalties on the actual price they received for the gas and NGLs and that Defendants breached that duty by taking excessive cost deductions and by failing to pay royalties on the best price reasonably possible. *Elliott,* 407 F.3d at 1113. In analyzing Plaintiffs' claim, the Tenth Circuit recognized that implied covenants are not favored under New Mexico law, especially when a written agreement between the parties is apparently complete. *Elliott,* 407 F.3d at 1112 (citing *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 115 N.M. 690, 858 P.2d 66, 80 (1993). The Tenth Circuit further noted that:

> [A]n implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument.

*Id*. The Tenth Circuit went on to hold that no duty to market existed, noting that the Plaintiff "failed

to present any analysis demonstrating that the implication of an unexpressed duty to market is necessary or appropriate." *Elliott*, 407 F.3d at 1114.

In the present case Plaintiffs attempt to distinguish *Elliott's* holding that no duty to market existed by arguing that *Elliott* focused on gas sales and in this case the focus is on NGLs. The Court does not see how the legal analysis set forth in *Elliott* and *Continental Potash* changes depending on the particular commodity that is the subject of the underlying contract. Nor does it agree that *Elliott* did not address the issue of NGLs. *Elliott* held that the question of whether the 39% processing fee was a cost that should be borne by BP or the royalty holders was a contract matter that did not implicate an implied duty to market. The fact that the processing fee has now been lowered to 25% does not change that analysis.

Under the contracts in this case, both parties agree that royalties are to be paid on the value of the gas at the well. As the *Elliott* court noted, plaintiffs cannot utilize an implied duty to "supplement the royalty provision and the 'at the well' language." *Elliott,* 407 F.3d at 1113. That is what the plaintiffs are attempting to do in the present case. It is not this Court's function to rewrite a contract by implying covenants between parties when an express written agreement exists. *See Continental Potash, Inc*., 115 N.M. 690, 858 F.2d at 83. Any arguments that Plaintiffs may have regarding the NGLs and the affiliate transfer prices could be and, in fact, have been raised in connection with the issue of calculating the value of the gas at the well under the contracts. No implied covenant is required.

The Court notes, however that even if this were not a contract issue, Plaintiffs' argument that BP fails to market 25% of the NGLs for the benefit of the royalty owners would not be viable. This position goes hand in hand with Plaintiffs' claim that BP doesn't pay royalties on the 25% of LNGs that it retains as a processing fee. The flaw in Plaintiffs' reasoning is that BP is obligated to

7

pay royalties on the value of the raw natural gas at the well, not on the processed gas and LNGs at the tailgate of the New Blanco Plant. Using the work-back method, BP is entitled to deduct the reasonable cost of processing the gas at New Blanco. As noted earlier, whether the amount of that deduction is derived from a cash fee, payment in kind (25% of the processed LNGs), or some other method is of no legal consequence. The issue is whether the deduction is reasonable and results in an accurate calculation of the market value of the gas at the well.

The analysis is the same with Plaintiffs' argument that BP breached its duty to market by using affiliate transfer prices instead of true, arms length sales prices. While Plaintiffs' first argument involved the deduction of costs under the work-back method, this argument addresses the first step of the work-back method, establishing the value of the residue gas and NGL values. The work-back method is used to calculate the value of the gas at the well, pursuant to the contract. This is a contract matter and there is no reason to resort to implied covenants for subjects that are treated in express provisions of the contract. See, *Elliott*, 407 F.3d at 1113; *Continental Potash, Inc*., 858 F.2d at 80.

Finally, the Court notes that the New Mexico Supreme Court has described the implied duty to market as an "implied covenant to make diligent efforts to market the production in order that the lessor may realize on his royalty interest." *Darr v. Eldridge*, 66 N.M. 260, 346 P.2d 1041, 1044 (N.M. 1959). The royalty holders' complaint in *Darr* was that the lessee was holding onto the property without selling the minerals. *Id.* As noted by the Tenth Circuit in *Elliott*, BP is actively producing gas, processing the gas, and selling the refined natural gas and NGLs. 407 F.3d at 1113. Plaintiffs are not arguing that their royalties should be increased because BP should be producing a greater quantity of gas at the well.

Therefore, Plaintiff's motion for summary judgment on BP's breach of an implied duty to

market is denied.

## C. Plaintiffs' Motion to Strike the Testimony of Dr. Becker

The next issue is Plaintiffs' Motion to Exclude Testimony of Defendant's Expert Stephen L. Becker (Doc. 146), filed on October 1, 2010. The admissibility of expert testimony is governed by Federal Rule of Evidence 702. The party proffering the expert testimony bears the burden of proving by a preponderance of the evidence that the expert's testimony is admissible pursuant to Rule 702. *See, e.g.*, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (citations omitted). Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

As interpreted by the Supreme Court, Rule 702 requires that an expert's testimony be both reliable, in that the witness is qualified to testify regarding the subject, and relevant, in that it will assist the trier in determining a fact in issue. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-92 (1993). To assist in the assessment of reliability, the Court in *Daubert* identified four nonexclusive factors that a trial court may consider: (1) whether the theory at issue can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

The Court has emphasized that this list is neither definitive nor exhaustive and that the

district court has wide discretion, both in deciding how to assess an expert's reliability and in making a determination of that reliability. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999). Accordingly, a trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions. *Daubert*, 509 U.S. at 595.

The trial court has discretion to determine how to perform its gatekeeping function under *Daubert*, including whether to have a hearing or not. In this case, the Court has determined that the record is sufficient to render a decision without a hearing.

First, the Court notes that the Plaintiffs are not challenging whether Dr. Becker is qualified as an expert by knowledge, skill, experience, training, or education. Nor are they challenging the general reliability of the principles and methods Dr. Becker uses. Dr. Becker's field of expertise is in economic analysis, and the concept of economic valuation by analysis of comparable sales is accepted in the field of economics, can be tested, and is subject to standards controlling the methodology's operation. Instead, Plaintiffs argue that Dr. Becker's analysis is legally wrong or irrelevant, and that the analysis is based on erroneous facts and data, i.e., comparable sales that are not comparable.

The foundation for Plaintiffs' motion to strike on the basis of legal error is the position that the deductions taken by BP in its work-back are not "actual" and that BP fails to pay royalties at all on 25% of the NGLs produced at the New Blanco Plant. The Court has rejected those positions in its discussion of Plaintiffs' motion for summary judgment on breach of contract. Therefore, Plaintiffs' argument that Dr. Becker's report is "contrary to accepted case law on permissible netback deductions" is not well taken. Nor does the Court agree that *Elliott* "does not allow" Dr. Becker's comparable sales study. To the contrary, while *Elliott* held that the processing costs

deducted under the work-back method must be reasonable, it did not discuss, let alone limit, the type of proof that a party could offer to prove reasonableness. "Comparable sales" is an accepted method of valuation. There may be a question as to whether the information Dr. Becker relies on his analysis is truly comparable to the contractual agreement between Plaintiffs and BP, but that is a decision to be made by the jury.

Nor does the mere fact that BP did not use Dr. Becker's methodology in calculating its 25% processing fee rule out the presentation of Dr. Becker's evidence at trial. *Elliott* did not hold that the reasonableness of a work-back deduction could only be proved by offering evidence of the manner in which the deduction was originally calculated. The Court does not see a problem with BP offering proof of the manner in which it originally calculated the processing fee, then calling Dr. Becker to offer his "comparable sales" analysis in support of the reasonableness of that original calculation. Of course, Plaintiffs will have the opportunity for rigorous cross-examination.

Finally, to the extent that Plaintiffs are arguing that *Piney Woods Country Life School v. Shell Oil Co.*, 726 F2d 225 (5th Cir. 1984) prohibits evidence of comparable sales to prove the reasonableness of a producer's work-back calculations (p. 14 of Plaintiffs' brief), the Court does not agree. It is true that "processing costs[2] may not be deducted from the royalties for gas 'sold at the well' because the price for such gas is based on its value before processing," 726 F.2d at 240, but the Court is not aware of any attempt to do so here. In a case such as this where the producer's work-back calculations were questioned, and in which there were true comparable sales at the well, it would appear to the Court that a reasonable work-back calculation could produce a value for gas at the well that was equal to those true comparable sales at the well. Therefore, evidence of those

---

[2]Here, the operation of the New Blanco Plant.

11

comparable sales at the well would be relevant and probative on the issue of the reasonableness of the producer's work-back calculation.

The Court can also envision evidence of "comparable sales" where the sales took place downstream of the processing plant, regardless of where title changed hands. In such instances the parties would essentially be comparing the producers' work-back methodologies, including deductions for processing. Plaintiffs' criticism of Dr. Becker's motivation and methodologies are appropriate subjects for cross examination at trial. Plaintiffs' motion to strike Dr. Becker as a witness is denied.

**D. Defendant's Motion for Summary Judgment on Compliance with Royalty Obligations**

Defendant BP moves for summary judgment on the basis that it has complied with its "market value of the gas at the well" contractual royalty obligations. Essentially, BP is asking the Court to declare, as a matter of law, that its work-back calculations and resultant valuation of the gas "at the well" are reasonable. The Court declines to do so. BP has offered evidence that its New Blanco Plant processing fee of 25% of NGLs is reasonable. Plaintiff has presented evidence that Conoco, BP's partner in operation of the New Blanco Plant, charges substantially less. Plaintiffs have also substantively contested the expert evidence upon which BP relies to conclude that its royalty valuation is reasonable. There are also legitimate questions raised by Plaintiffs regarding the calculation of affiliate transfer prices upon which BP's work-back calculation is based. These are classic questions of fact to be resolved by the jury. Plaintiffs have presented sufficient evidence that a genuine issue of material fact exists as to the "reasonableness" issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, BP's motion for summary judgment is denied.

**E.  Defendants's Motion for Summary Judgment on the Punitive Damages Claim**

Defendant BP moves for summary judgment dismissing Plaintiffs' claims for punitive damages.  Plaintiffs' punitive damages claim is based on its allegation that BP deducts a "fictitious 25% processing fee" and, therefore, does not pay a royalty on all production from the leases; deducts a marketing fee associated with a simple transfer on paper of the NGLs to a BP affiliate; and uses affiliate transfer prices in the work-back methodology to value the NGLs.  BP responds that at least since 2005 it has been public knowledge that BP approximates the market value of the gas at the well by deducting post-production costs, including processing, gathering, transportation, fractionation and marketing costs, from the value of the residue gas and NGLs created by processing the gas stream.  BP argues that it has not concealed information or acted maliciously or wilfully, and that its deductions were reasonable and produced aggregate well head value per MMBtu consistent with other wells connected to the Enterprise gathering system.

Both parties note that there have been two other lawsuits involving the same leases.  BP originally charged a 39% processing fee in computing the value of the gas at the well.  Subsequent to those cases BP lowered its processing fee from 39% to the currently disputed 25%.

Whether punitive damages are warranted in a diversity action is a question of state law. *Klein v. Grynberg*, 44 F.3d 1497, 1503 (10th Cir. 1995).  Under New Mexico law an award of punitive damages in a breach of contract case may be made only where there is a showing of evil motive or culpable mental state. See *Paiz v. State Farm Fire and Casualty Co.*, 118 N.M. 203 (1994).  Moreover, when addressing claims for punitive damages in breach of contract cases, New Mexico courts consider the "fundamental tenet" of contract law that an injured party should not be put in a better position that it would have been in had there been no breach, *regardless* of the character of the breach.  *Id.* at 309.  Thus, "[a]n intentional breach by itself ordinarily cannot form

13

the predicate for punitive damages, not even when the breach is flagrant, that is, when there is no question that the conduct breaches the contract, even if the other party will clearly be injured by the breach." *Bogle v. Summit Invest. Co.*, 137 N.M. 80, 107 P.3d 520 (2005).

The heart of Plaintiffs' claim for punitive damages is the claim that the 25% processing fee is "fictitious" and that BP does not pay royalties on all production. As noted in earlier sections of this Memorandum Opinion and Order, these positions are not well taken. BP is entitled to a deduction for the cost of operating the New Blanco Plant because there is an actual cost to operating the plant and because the plant adds value to the gas stream. If BP's 25% processing fee is found by a jury to be unreasonable, then BP is liable for breach of contract. Although Plaintiffs point to the *Elliott* and *Dichter* cases as evidence of BP's current malfeasance, the Court does not agree. Both sides in this case are sophisticated parties, represented by experienced counsel, who have been litigating BP's royalty obligations for ten years. The arguments presented by Plaintiffs in *Elliott*, though couched in tort, were nearly identical to the arguments presented here, except it was a 39% fee that Plaintiffs questioned in *Elliott*. This case is for all intents and purposes an extension of the earlier contractual disputes.

While factual issues do exist as to whether the contract was breached, for example whether BP's current 25% fee represents a reasonable deduction for the value of the processing at the New Blanco Plant, evidence of the necessary culpable mental state needed for punitive damages in a breach of contract case is not present. Plaintiffs have not presented evidence that BP violated a court order arising from the earlier case, or maliciously breached the terms of a settlement agreement in one of the earlier cases. Accordingly, the Court finds that the motion is well taken.

**IV. Conclusion**

For the reasons set forth above, it is hereby ordered that:

1)  Plaintiffs' Motion for Summary Judgment on Breach of Contract and Breach of the Duty to Market (Doc. 148) is DENIED;

2) Plaintiffs' Motion to Exclude the Opinion Testimony of BP Expert Witness Dr. Stephen L. Becker  (Doc. 146) is DENIED;

3)  Defendant BP's Motion For Summary Judgment on Compliance with the "Market Value at the Well" Contractual Royalty Obligation (Doc. 137) is DENIED; and

4)  Defendant BP's Motion for Summary Judgment on Plaintiffs' Punitive Damages Claim. (Doc. 140) is GRANTED.

       IT IS SO ORDERED.

                                                        _____
                                                        W. DANIEL SCHNEIDER
                                                        UNITED STATES MAGISTRATE JUDGE